

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CAROL DUBOIS,

               Plaintiff,

-against-

COMMISSIONER OF SOCIAL
SECURITY,

               Defendant.

20-CV-8422 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Carol DuBois filed this action pursuant to § 205(g) of the Social Security Act (Act), 42 U.S.C. § 405(g), seeking judicial review of a final determination of the Commissioner of Social Security (Commissioner) denying her application for Disability Insurance Benefits (DIB). Now before me are the parties' cross-motions for judgment on the pleadings. For the reasons that follow, plaintiff's motion (Dkt. No. 20) will be denied, the Commissioner's motion (Dkt. No. 22) will be granted, and the case will be dismissed.

## Background

Plaintiff worked a police officer for the Village of Chester and the Town of Deer Park, and then, from May 2008 to June 2014, as a deputy sheriff and investigator for the Orange County Sheriff's Office. *See* Certified Administrative Record (Dkt. No. 14) (hereinafter "R. __") at 53, 56, 254. On February 13, 2013, in the course of executing a search warrant, she slipped on black ice in a driveway, slid into a police vehicle, and sustained various injuries. (R. 60, 301.) Those injuries left her with osteoarthritis of the bilateral knees and tears in her menisci, injury to the bilateral hips, lower back problems, and left shoulder impingement syndrome with rotator cuff tendinosis. (R. 29, 34, 60-65, 301, 309, 344, 381, 394.) Plaintiff also has arthritis in her right hand and experiences vertigo. (R. 34, 66-67, 324.) She has consistently pursued medical treatment for her physical impairments, including, most recently, bilateral knee replacement surgery on August 8,

2019. (R. 10-22, 293-332, 368-422.) Plaintiff's physical impairments are not, however, the focus of the present action.

Plaintiff applied for DIB on November 28, 2017 – more than three years after she separated from the Orange County Sheriff's Office – alleging disability as of January 26, 2017, due to injuries to her knees, left shoulder, back, and both hips, as well as anxiety and post-traumatic stress disorder (PTSD). (R. 113, 129-31, 234, 254.) Plaintiff was 43 years old on the claimed onset date. (R. 38.) Because her application did not identify any past mental health diagnoses or treatment (*see* R. 250-59), the Social Security Administration (SSA) arranged for her to undergo a psychiatric evaluation on January 29, 2018, performed by Alison Murphy, Ph.D. (R. 333-39.) That evaluation confirmed that plaintiff had never been hospitalized for psychiatric reasons, had never been prescribed any psychotropic medication, and had last sought outpatient counseling in 2012 – some five years prior to her alleged onset date – when she availed herself of an EAP (employee assistance program) referral "two to three times a week to address depression and anxiety." (R. 334.)

Based on plaintiff's self-report during the evaluation, Dr. Murphy catalogued the following symptomology: (1) for depression, "[c]rying spells, guilt, loss of usual interest, irritability, fatigue, loss of energy, worthlessness, diminished self-esteem, concentration difficulties, diminished sense of pleasure, and social withdrawal," but "[n]o suicidal or homicidal ideation"; (2) for anxiety, "[e]xpressive apprehension and worry, easily fatigued, irritability, fear of being judged or negatively evaluated in social settings, avoidance of social settings, restlessness, difficulty concentrating, muscle tension, phobic responses to crowds and enclosed spaces, trauma, exposure to trauma, flashbacks, nightmares, hypervigilance, avoidance, intrusive thoughts, detachment from others," as well as "panic attacks" (up to four times a month, each lasting up to an hour), "palpitations, fear of losing control, sweating, dizziness, breathing difficulties, and trembling"; and

2

(3) for cognitive deficits, "[s]hort-term memory deficits, concentration difficulties, long-term memory deficits, and organization difficulties." (R. 334-35.) Dr. Murphy did not list any manic symptomology or thought disorders.

When Dr. Murphy performed a mental status exam, she found that plaintiff had a "cooperative" demeanor and was responsive to questions; had an "adequate" manner of relating, social skills, and overall presentation; had normal posture and motor behavior; made "appropriate" eye contact; spoke fluently and clearly; demonstrated "[c]oherent and goal directed" thought processes with "no evidence of hallucinations, delusions, or paranoia in the evaluation setting"; had a "[c]lear" sensorium; was oriented x3; had "[i]ntact" recent and remote memory skills; and displayed average intellectual functioning, fair insight, and fair judgment. (R. 335-36.) Her affect was "[a] little anxious and depressed," and she reported "feeling anxious and depressed" that day. (R. 336.) Plaintiff also demonstrated "[m]ildly impaired" attention and concentration, "due to anxiety or nervousness in the evaluation." (*Id.*)

Plaintiff told Dr. Murphy that she could "dress, bathe, and groom herself independently"; that she cooked once a week (because her husband enjoyed cooking most of the time); that she had difficulty cleaning and doing laundry because of pain in her knees, hips, and shoulder; that she did not go shopping because she would become "too overwhelmed"; but that she could "manage money effectively" and drive herself; and that she "spen[t] most of her day" reading, watching television, and playing with her dog. (R. 336-37.)

Dr. Murphy diagnosed plaintiff with unspecified depressive disorder, unspecified anxiety disorder, PTSD, and panic attacks without agoraphobia. (R. 337.) In her medical source statement, she wrote that there was "[n]o evidence of limitation" in plaintiff's ability to understand, remember, and apply simple directions and instructions, to use reason and judgment to make work-related

3

decisions, to maintain personal hygiene and appropriate attire, and to be aware of normal hazards

and take appropriate precautions; "[m]ild limitation" in her ability to understand, remember, and

apply complex directions and instructions, and to sustain concentration and perform a task at a

consistent pace; and "[m]oderate limitation" in her ability to interact adequately with supervisors,

coworkers, and the public, to sustain an ordinary routine and regular attendance at work, and to

regulate emotion, control behavior, and maintain well-being. (R. 337.) Dr. Murphy concluded that

plaintiff's psychiatric problems "may significantly interfere with [her] ability to function on a daily

basis." (R. 337.)

On February 9, 2018, state agency reviewer M. Momot-Baker, Ph.D. evaluated plaintiff's

mental functioning based on the record available at that time, which consisted primarily of

Dr. Murphy's evaluation. (R. 115-17, 121-23.) First, Dr. Momot-Baker evaluated plaintiff's mental

impairments using the psychiatric review technique (PRT) mandated by 20 C.F.R. § 404.1520a.[1]

She found that plaintiff had a "[m]ild" limitation in understanding, remembering, or applying

---

[1] The PRT requires the Commissioner to "rate the degree of [the claimant's] functional limitation based on the extent to which [her] impairment(s) interferes with [her] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. § 404.1520a(c)(2). The degree of functional limitation is rated in "four broad functional areas," including the claimant's ability to: (i) "[u]nderstand, remember, or apply information"; (ii) "interact with others"; (iii) "concentrate, persist, or maintain pace"; and (iv) "adapt or manage [her]self." *Id.* § 404.1520a(c)(3). The degree of limitation in each area is rated on a five-point scale: "None, mild, moderate, marked, and extreme." *Id.* § 404.1520a(c)(4). If the claimant's limitations are rated "none" or "mild" in all four functional areas, her mental impairment will generally be found "not severe," meaning that it does not cause "more than a minimal limitation in [the claimant's] ability to do basic work activities." *Id.* § 404.1520a(d)(1). If the claimant's limitations are greater than "mild," such that her mental impairment is deemed "severe," the Commissioner must then "determine if [the impairment] meets or is equivalent in severity to a listed mental disorder." *Id.* § 404.1520a(d)(2). For most mental disorders, equivalence may be demonstrated by satisfying, among other things, the so-called "paragraph B" criteria, which in turn require the claimant to show that her mental disorder "result[s] in 'extreme' limitation of one, or 'marked' limitation of two," of the same four broad functional areas. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.00A(2)(b), 12.00E.

information; a "[m]oderate" limitation in interacting with others; a "[m]oderate" limitation in concentrating, persisting, or maintaining pace; and a "[m]oderate" limitation in adapting or managing oneself. (R. 116.) Based on these ratings, Dr. Momot-Baker found that plaintiff's mental impairments were "severe" (R. 123), but did not meet or equal any listed mental disorder. (R. 116.)[2]

Dr. Momot-Baker also considered plaintiff's mental residual functional capacity (RFC) (R. 121-23), and concluded that she is able to understand and remember simple and more detailed instructions and procedures, perform routine tasks at a reasonable pace, sustain an adequate work schedule, and "appropriately engage in basic interactions to meet work-related needs." (R. 123.) Dr. Momot-Baker also found that, despite "some difficulty in coping with stress," plaintiff demonstrated "adequate ability to adapt to changes and deal with the mental demands of a work setting." (R. 123.)

On February 26, 2018, plaintiff's claim was administratively denied. (R. 132-41.) On March 15, 2018, she requested a hearing before an administrative law judge (ALJ) (R. 142-44), and on July 1, 2019, she appeared with her attorney at a video hearing before ALJ Kieran McCormack. (R. 43-88.) Linda A. Stein, an impartial vocational expert, also testified. (R. 44.)

## The ALJ's Decision

On July 18, 2019, the ALJ issued an unfavorable decision (Decision) (R. 23-42), concluding that plaintiff was not disabled. (R. 39.) Before undertaking the five-step analysis mandated by 20 C.F.R. § 404.1520(a)(4)(i)-(v), the ALJ found that plaintiff met the insured status requirements of the Act through December 31, 2019. (R. 28.)

---

[2] Dr. Momot-Baker considered Listing 12.04 (depressive, bipolar, and related disorders), Listing 12.06 (anxiety and obsessive-compulsive disorders), and Listing 12.15 (trauma and stressor-related disorders). (R. 116.)

At step one of the five-step analysis, *see* 20 C.F.R. § 404.1520(a)(4)(i), the ALJ found that plaintiff had not engaged in substantial gainful activity since January 26, 2017. (R. 28.) At step two, *see* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1521, 404.1522, he found that plaintiff's osteoarthritis of the bilateral knees, lumbar straightening, left shoulder impingement syndrome, arthritis of the right hand, and vertigo were "severe" impairments (R. 29), but that her essential hypertension, bilateral hip impairment, left foot injury, and obesity were "non-severe" impairments. (R. 29-30.) The ALJ also found that plaintiff's depression, anxiety, and PTSD were non-severe, in that – considered singly and in combination – they "do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities." (R. 30.) In making this finding, the ALJ considered the same four "broad functional areas of mental functioning" previously considered by Dr. Momot-Baker, but came to a different conclusion: that plaintiff had only a "mild" limitation in each area. (R. 30-31.) At step three, 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525, 404.1526, the ALJ found that none of plaintiff's severe impairments, individually or in combination, met or equaled the severity of any Listing. (R. 31-32.)

Before proceeding to step four, the ALJ – having "considered all of [plaintiff's] medically determinable physical impairments, including those that are not severe" (R. 30) – found that she had the RFC to perform sedentary work, as defined in 20 C.F.R. § 404.1567(a),[3] except that she:

> . . . cannot not climb ladders, ropes, or scaffolds. She can climb ramps and stairs, stoop, kneel, crouch, and crawl on an occasional basis. She can balance on a frequent basis. She can reach in all directions, including overhead, with her non-dominant left arm on an occasional basis. She can finger with her dominant right hand on a frequent basis. She cannot work at jobs containing any exposure to

---

[3] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

unprotected heights, unprotected machinery, and/or machinery with moving mechanical parts.

(R. 32.)

In developing plaintiff's RFC, the ALJ found Dr. Murphy's opinion – in particular, her assessment that plaintiff's psychiatric problems "may significantly interfere with her ability to function on a daily basis" – to be "unpersuasive." (R. 36.) The ALJ noted that Dr. Murphy's conclusion was based on a "one-time meeting" and explained that it was inconsistent with plaintiff's mental status examination during that meeting, which was "completely normal" but for her "subjective report of feeling a little anxious and depressed," and Dr. Murphy's finding that her attention and concentration were "only mildly impaired." (R. 36.) The ALJ further reasoned that Dr. Murphy's opinion was inconsistent "with the lack of psychiatric treatment and medication use as evidenced by the unremarkable record," and the "lack of psychiatric complications shown by the rest of the evidence of record." (R. 36.) Addressing that evidence earlier in the Decision, the ALJ noted that plaintiff "described a broad range of daily activities, which do not evince disabling symptoms," including light housework and cooking (with assistance from her husband for heavier tasks); driving (short distances, before being limited by shoulder pain); hobbies such as reading and watching television; and helping in her husband's pet store "as needed during the day." (R. 34-35.) Similarly, the ALJ found Dr. Momot-Baker's opinion unpersuasive, "as the degree of functional limitations and the residual functional capacity are entirely based upon the findings of the psychological consultative examiner [Dr. Murphy], which are unpersuasive for the reasons outlined . . . above." (R. 37.)

At step four, *see* 20 C.F.R. § 404.1520(a)(4)(iv), the ALJ found that plaintiff could not perform her past relevant work as a police officer due to her physical impairments (R. 37-38), but at step five, *see* 20 C.F.R. § 404.1520(a)(4)(v), the ALJ determined, based on VE Stein's expert

testimony at the hearing (R. 79-84), that plaintiff could maintain sedentary employment, including as a telephone solicitor, surveillance system monitor, or election clerk. (R. 38-39.)

On August 10, 2020, the Appeals Council denied plaintiff's request for review of the Decision (R. 1), rendering the ALJ's determination final.

## The Parties' Positions

Plaintiff argues that the ALJ erred in two respects. Pl. Mem. (Dkt. No. 21) at 11-22. First, according to plaintiff, the ALJ failed to incorporate "his own mental health limitations findings" at step two (that is, that plaintiff had "mild limitations in all four areas of mental functioning") into the RFC, which contains "no mental health restrictions." *Id.* at 11-14; *see also* Pl. Reply Mem. (Dkt. No. 26) at 1-3. Second, plaintiff argues, the ALJ failed properly to weigh the opinions of Drs. Murphy and Momot-Baker, inappropriately substituting his own lay opinion for their expertise. Pl. Mem. at 14-22; Pl. Reply Mem. at 3-4.

The Commissioner contends that the Decision is supported by substantial evidence, in that the ALJ correctly incorporated his step two findings – that plaintiff's mental health limitations were "mild" and her impairments "non-severe" – into his RFC assessment, and properly discounted the opinions of Drs. Murphy and Momot-Baker upon consideration of the entire record before him. Def. Opp. (Dkt. No. 23) at 12-25.

I agree with the Commissioner on both points.

## Standards

In considering the parties' motions, I have reviewed the entire administrative record (totaling 422 pages) and applied the familiar and frequently reiterated standards used by federal district courts to review decisions of the Commissioner. Generally speaking, a court may set aside an ALJ's decision only if it is based upon legal error or if the ALJ's factual findings are not

supported by substantial evidence. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Calvello v. Barnhart*, 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008), *report and recommendation adopted*, 2008 WL 4449357 (S.D.N.Y. Oct. 1, 2008); *Conyers v. Comm'r of Soc. Sec.*, 2019 WL 1122952, at *11-12 (S.D.N.Y. Mar. 12, 2019).

"Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Longbardi v. Astrue*, 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009) (citing *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) and *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)). However, the reviewing court's task is limited to determining whether substantial evidence exists to support the ALJ's fact-finding; it may not reweigh that evidence or substitute its judgment for that of the ALJ where the evidence is susceptible of more than one interpretation. "[O]nce an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise.*" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (quotation marks omitted). Thus, the substantial evidence standard is "a very deferential standard of review." *Id.*

A claimant's RFC is the "most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). A claimant's RFC is based on all of the relevant medical and other evidence in the record, including her credible testimony, objective medical evidence, and medical opinions from treating and consulting sources. 20 C.F.R. § 404.1545(a)(3). Although necessarily informed by the medical evidence in the record, "[a]n RFC finding is administrative in nature, not medical,

and its determination is within the province of the ALJ[.]" *Curry v. Comm'r of Soc. Sec.*, 855 Fed. App'x 46, 48 n.3 (2d Cir. 2021).

When formulating a claimant's RFC, the ALJ must "consider" not only severe impairments, but non-severe impairments as well. 20 C.F.R. § 404.1545(a)(2); *see also* SSR 96-8p, 1996 WL 374184 (S.S.A. July 2, 1996), at *2, 5. This does not mean, however, that the ALJ must include a specific limitation in the RFC corresponding to each of the claimant's non-severe impairments. To the contrary: by definition, an impairment which is not severe "does not significantly limit [the claimant's] physical or mental ability to do basic work activities," 20 C.F.R. § 404.1522(a), including mental work activities such as "[u]nderstanding, carrying out, and remembering simple instructions," "[u]se of judgment, "[r]esponding appropriately to supervision, co-workers and usual work situations," and "[d]ealing with changes in a routine work setting. *Id.* § 404.1522(b)(3)-(6). As our Circuit has explained, "the standard for a finding of severity" at step two "is *de minimis* and intended to screen out the very weakest cases." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014). Nonetheless, it is possible that, "in combination with limitations imposed by an individual's other impairments, the limitations due to . . . a 'not severe' impairment *may* prevent an individual from performing past relevant work or *may* narrow the range of other work that the individual may still be able to do." SSR 96-8p, 1996 WL 374184 at *5 (emphasis added). Thus, in formulating a claimant's RFC, the ALJ must consider even non-severe impairments that would not, standing alone, require the analysis to proceed past step two.

In evaluating a disability claim filed on or after March 27, 2017 – including the claim at issue here – the ALJ need not "defer" or "give any specific evidentiary weight, including controlling weight," to any medical opinion or prior administrative medical finding. 20 C.F.R.

§ 404.1520c(a). Rather, the ALJ must evaluate the "persuasiveness" of each opinion or finding in light of: (i) its "[s]upportability"; (ii) its "[c]onsistency"; (iii) the "[r]elationship" between the medical source and the claimant; (iv) the source's "[s]pecialization" in a relevant medical field; and (v) "other factors that tend to support or contradict" the opinion or finding. 20 C.F.R. § 404.1520c(c)(1)-(5). Of these, the most important factors are "supportability" and "consistency." *Id.* § 404.1520c(b)(2); *see also Rivera v. Comm'r of the Soc. Sec. Admin.*, 2020 WL 8167136, at *11 (S.D.N.Y. Dec. 30, 2020), *report and recommendation adopted sub nom. Rivera v. Comm'r of Soc. Sec. Admin.*, 2021 WL 134945 (S.D.N.Y. Jan. 14, 2021).

As to supportability, the regulations provide: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1). As to consistency: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2). The ALJ need not discuss all of the factors described in the regulations, but must, as to each opinion or prior administrative medical finding, "explain how [he or she] considered the supportability and consistency factors." *Id.* § 404.1520c(b)(2).

In weighing medical opinions, "[t]he ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015). Regardless of how many (or how few) medical source statements the ALJ receives, however – or the weight he assigns to them – the determination of the claimant's RFC is reserved to the ALJ, who is not required to accept, or

follow, any one medical opinion. *See Camille v. Colvin*, 652 Fed. App'x 25, 29 n.5 (2d Cir. 2016) (summary order) ("An ALJ may accept parts of a doctor's opinion and reject others."). "[I]t is the ALJ's prerogative to make an RFC assessment after weighing the evidence and the District Court may not reverse provided there is substantial evidence in the record to support her findings." *Moronta v. Comm'r of Soc. Sec.*, 2019 WL 4805801, at *19 (S.D.N.Y. Sept. 30, 2019) (quoting *Mitchell v. Astrue*, 2010 WL 3070094, at *5 (W.D.N.Y. Aug. 4, 2010)) (alteration in original).

### The ALJ Properly Considered Plaintiff's Non-Severe Mental Impairments

Plaintiff contends that, because the RFC formulated by the ALJ does not include any "mental health restrictions," Pl. Mem. at 12, it is "inconsistent[]" with his step two finding that plaintiff had "medically determinable" (albeit non-severe) mental health impairments, including "mild" limitations in each of the four functional areas assessed. *Id.* at 11, 13; *see also* Pl. Reply Mem. at 1-2 (arguing again that there was an "inconsistency" between the ALJ's step two determination and his FC formulation). In essence, plaintiff's argument is that once an ALJ has identified a medically determinable impairment at step two – even a *de minimis* impairment, *see McIntyre*, 758 F.3d at 151, which "does not significantly limit [the claimant's] physical or mental ability to do basic work activities," 20 C.F.R. § 404.1522(a) – it is error if the ALJ fails to include a corresponding "mental health restriction" in the claimant's RFC. The cases she cites for that proposition, however, do not support it.[4]

---

[4] Neither *Smith v. Comm'r of Soc. Sec.*, 2018 WL 1684337, at *4 (N.D.N.Y. Apr. 5, 2018), nor *Hendrickson v. Astrue*, 2012 WL 7784156 (N.D.N.Y. Dec. 11, 2012), involved a claim similar to that made here, *i.e.*, that the RFC must incorporate mental restrictions corresponding to "mild" mental limitations cataloged at step two in the course of determining that the claimant's mental impairments were non-severe. In *Smith*, plaintiff did not allege any mental impairments at all. In *Hendrickson*, plaintiff's mental impairments were determined to be "severe" at step two, 2012 WL 7784156, at *5; *see also id.* at *8, *8 n.12 (describing mental impairments as "long-standing and severe" and noting that plaintiff's extensive mental health treating notes "reflect that [his] episodes

The regulations do require the ALJ to "consider" all of the claimant's medically determinable physical impairments, "including those that are not severe." 20 C.F.R. § 404.1545(a)(2); SSR 96-8p, 1996 WL 374184, at *5. Here, as the Commissioner points out, *see* Def. Opp. at 14, the ALJ did just that.

First, the ALJ considered that – aside from her use of an EAP to receive outpatient counseling "two to three times a week" five years prior to her claimed onset date (R. 334) – plaintiff never sought or received mental health treatment of any sort, and was never prescribed any psychotropic medications. (R. 30, 35-36.)[5] The ALJ did not err in relying on plaintiff's history of non-treatment for her claimed mental impairments in formulating her RFC. *See Navan v. Astrue*, 303 Fed. App'x 18, 20 (2d Cir. 2008) (summary order) ("[T]he ALJ appropriately relied on the near absence of any medical records between March 1997 and June 1999 to find that Navan's claims of total disability were undermined by his failure to seek regular treatment for his allegedly disabling condition."). Plaintiff's speculation that her failure to seek treatment could itself be a manifestation of a mental disorder that left her "less capable of making sound judgments with

are triggered by major stresses"), but were inadequately accounted for in the ALJ's RFC determination, which limited him to "unskilled work" but did not otherwise address his mental limitations in general or his difficulties with stress in particular. *Id.* at *8; *see also* SSR 85-15, 1985 WL 56857, at *6 (S.S.A. 1985) (in the case of mental disorders, "the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job").

[5] The use of prescription medications to treat depression and anxiety is exceedingly common in the United States. During the period 2015-18, 17.7% of all adult women in the United States "used antidepressant medications in the past 30 days." Centers for Disease Control and Prevention, National Center for Health Statistics, "Antidepressant Use Among Adults: United States, 2015-2018" (September 2020), https://www.cdc.gov/nchs/products/databriefs/db377.htm (last visited March 21, 2022). Moreover, "[p]rimary care providers prescribe 79 percent of antidepressant medications and see 60 percent of people being treated for depression in the United States," making treatment available without a specialist visit. Andres Barkil-Oteo, *Collaborative Care for Depression in Primary Care: How Psychiatry Could "Troubleshoot" Current Treatments and Practices*, 86 Yale J. Biol. Med. 139, 139 (June 13, 2013), *available at* https://www.ncbi.nlm.nih.gov/labs/pmc/articles/PMC3670434/ (last visited March 21, 2022).

respect to . . . treatment," Pl. Mem. at 19-20 (citing out-of-Circuit authority), finds no support in the record, which shows that: (i) she sought treatment for depression and anxiety *prior* to her claimed onset date, but not thereafter; and (ii) she continued to seek treatment for her *physical* impairments *after* her claimed onset date, but did not mention any mental health symptoms to her doctors. Moreover, nothing in the record suggests that plaintiff's judgment was deficient.[6]

Second, without the benefit of a treating physician's insight or a longitudinal record of plaintiff's mental health, *cf. Bodden v. Colvin*, 2015 WL 8757129, at *9 (S.D.N.Y. Dec. 14, 2015) (noting that "the longitudinal relationship between a mental health patient and her treating physician provides the physician with a rich and nuanced understanding of the patient's health that cannot be readily achieved by a single consultative examination"), the ALJ properly considered the mostly unremarkable mental status examination conducted by Dr. Murphy on January 29, 2018. (R. 30-31, 34-36.) Not only did Dr. Murphy find plaintiff's judgment and insight "fair"; she observed, *inter alia*, that plaintiff was cooperative and responsive; had adequate social skills and overall presentation; demonstrated normal posture and motor behavior; made appropriate eye contact; spoke fluently and clearly; demonstrated coherent and goal-directed thought processes; and had a clear sensorium and an intact recent and remote memory. (R. 335-36.) Moreover, despite her subjective report that she felt anxious and depressed, she exhibited only "[a] little" anxiety and depression, and "[m]ildly impaired" attention and concentration, which Dr. Murphy attributed in

---

[6] On November 6, 2017 (more than nine months after her alleged onset date and just three weeks before she filed her DIB application), when plaintiff visited her internist Ralph Bowman, M.D., to seek treatment for right hand pain and vertigo, she denied depression or anxiety and – during her mental status exam – exhibited normal mood, affect, behavior, judgment, and thought content. (R. 323-24.) On January 29, 2018, during an internal medicine examination by consultative examiner John Caruso, M.D., plaintiff's mental status exam was again normal, with "[n]o evidence of impaired judgment or significant memory impairment." (R. 348.) According to Dr. Caruso, plaintiff was "very level headed." (*Id.*)

part to nervousness about the evaluation itself. (R. 336.) The ALJ did not err in citing these findings when explaining how he arrived at his RFC formulation. (R. 36.)

Nor did he err in relying, in part, on plaintiff's activities of daily living (ADLs), which include reading, watching television, taking care of her dogs, occasionally cooking, performing light housekeeping (limited only by her physical impairments), driving (also limited by her physical impairments), and visiting her husband's pet store "to help out as needed" and socialize. (R. 31, 34-35, 72-73).[7] Of course, ADLs at this level do not affirmatively demonstrate that plaintiff could hold down a full-time job. *Cf.* 20 C.F.R. pt. 404, subpt. P, app. 1 § 1200(H)(3)(d)-(e) (noting that "[t]he fact that [a claimant] engage[s] in common everyday activities, such as caring for [her] personal needs, preparing simple meals, or driving a car, will not always mean that [she] do[es] not have deficits in adaptive functioning" concomitant with mental health disorders). They do, however, undermine plaintiff's contention that a "social contact limitation" should have been written into her RFC, *see* Pl. Reply Mem. at 3, which would have "eliminate[d] any sedentary work" that she could otherwise perform. *Id.*[8]

Since the ALJ properly considered plaintiff's non-severe mental impairments in determining her RFC, the fact that he ultimately did not include a "social contact limitation" (or other mental health restrictions) in the RFC was not error.

---

[7] Plaintiff testified that on a typical day she goes to her husband's business around 11:00 or 12:00, and "check[s] in to see if . . . the people [th]at work for him need anything." (R. 72.) For example, "I might pick up change at . . . a bank and drop it off for them." (*Id.*) At times "I've gone down and, and stayed down there and, you know, just talked to people, interact with people." (R. 73.)

[8] That contention is also undermined, to some degree, by Dr. Momot-Baker's finding that plaintiff "can appropriately engage in basic interactions to meet work-related needs." (R. 123.)

**The ALJ Appropriately Weighed the Opinions of Drs. Murphy and Momot-Baker**

Plaintiff acknowledges that, under the regulations applicable to her application, the ALJ need not "defer" or "give any specific evidentiary weight" to any medical opinions, including those of Drs. Murphy and Momot-Baker. Pl. Mem. at 14 (citing 20 C.F.R. § 404.1520c(a)). She argues, however, that it was error for the ALJ to discredit Dr. Murphy's opinion on the ground that it was a "one-time examination," because "there was no contradictory opinion from any other examining source," *id.* at 15, and because "the agency specifically requested this consultative examination." *Id.* at 16.

Section 404.1520c affirmatively requires an ALJ to consider, among other things, the "[r]elationship" between a medical source and the claimant, including the "length" of the relationship, the "[f]requency of examinations," the "[p]urpose" of the relationship, and its "[e]xtent." 20 C.F.R. §§ 404.1520c(c)(3)(i)-(iv). Consequently, it could not have been error for ALJ McCormack to consider these factors.[9] Moreover, consultative examinations by definition are those "specifically requested" by the agency. *See* 20 C.F.R. §§ 404.1512(b)(2), 404.1517. The resulting opinions are not, for that reason, entitled to any additional deference.

---

[9] Although the regulation is new, the SSA and the courts have long recognized the dangers of over-reliance on the results of a single examination by a consultative source, especially "in the context of mental health where . . . a one-time snapshot of a claimant's status may not be indicative of her longitudinal mental health." *Estrella v. Berryhill*, 925 F.3d 90, 98 (2d Cir. 2019); *accord Bodden*, 2015 WL 8757129, at *9. Even where treating notes exist, consultative examiners typically do not have access to them, and consequently must "rely[] in meaningful part on the claimant's subjective reports and anomalous presentation, rather than a full knowledge of the longitudinal nature of the claimant' impairments." *Knief v. Comm'r of Soc. Sec.*, 2021 WL 5449728, at *9 (S.D.N.Y. Nov. 22, 2021). This too can diminish the reliability of a consultative examiner's opinion. *See id.* at *2, 7, 9 (upholding ALJ's determination that opinion of one-time consultative examiner, who relied on claimant's self-report to find that her mental impairments "may significantly interfere with [her] ability to function on a daily basis," was "unpersuasive") (alteration in original).

Nor was the ALJ required to accept Dr. Murphy's opinion simply because it was not contradicted by another opinion. In evaluating the supportability of an opinion or prior administrative finding, an ALJ is expressly authorized to compare it to the "objective medical evidence and supporting explanations" presented by the opining source. 20 C.F.R. § 404.1520c(c)(1). Thus, "supportability," under the new regulations, "has to do with the fit between the medical opinion offered by the source and the underlying evidence and explanations 'presented' by that source to support her opinion." *Rivera*, 2020 WL 8167136, at \*16*; see also Rosario v. Comm'r of Soc. Sec.*, 2022 WL 819810, at \*10 (S.D.N.Y. Mar. 18, 2022) (ALJ satisfied "the supportability factor" by "analyzing Ms. Rubino's underlying treatment records against her opinion, and finding an incongruity"). Here, the ALJ found an "incongruity" between Dr. Murphy's conclusions and her underlying examination results, which, as the ALJ noted, were "completely normal" (R. 36) except that plaintiff was "[a] little" anxious and depressed," with "mild" attention and concentration issues. (R. 336.)

Consistency, on the other hand, "is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record," which may or may not contain another medical opinion as a comparator. *Vellone on behalf of Vellone v. Saul*, 2021 WL 319354, at \*6 (S.D.N.Y. Jan. 29, 2021), *report and recommendation adopted*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021). Here, the ALJ permissibly found Dr. Murphy's opinion inconsistent with the "lack of psychiatric treatment and medication," as well as the lack of any "psychiatric complications shown by the rest of the evidence of record." (R. 36.) As discussed above, the "rest of the evidence" revealed, among other things, that plaintiff expressly denied any depression or anxiety when she was seen by her internist on November 6, 2017 (R. 323-24), had consistently normal mental status

exams (R. 324, 348), and regularly helped out, on a voluntary basis, at her husband's pet store, sometimes staying at the store to "interact with people." (R. 72-73.)

Because the ALJ was expressly authorized – indeed, required – to consider whether Dr. Murphy's opinion was consistent with "the entire record," *Vellone*, 2021 WL 319354, at *6, plaintiff's argument that in so doing the ALJ inappropriately substituted his own lay judgment for that of "a qualified medical expert," Pl. Mem. at 16, is unavailing. *See Curry*, 855 Fed. App'x at 48 n.3 (ALJ does not inappropriately rely on lay opinion by reconciling evidentiary conflicts when considering "the medical and *other relevant evidence* in the record in its totality" to reach an RFC determination) (emphasis added); *Monroe v. Comm'r of Soc. Sec.*, 676 Fed. App'x 5, 7 (2d Cir. 2017) (summary order) (ALJ appropriately rejected sole medical opinion where it was unsupported by other evidence in record); *Matta v. Astrue*, 508 Fed. App'x 53, 56 (2d Cir. 2013) (summary order) ("Although the ALJ's conclusion may not perfectly correspond with any of the . . . medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole.").

ALJ McCormack therefore did not err in finding "unpersuasive" (R. 36) Dr. Murphy's conclusion that plaintiff had "psychiatric problems that may significantly interfere with [her] ability to function on a daily basis." (R. 337.) By the same token, he did not err in finding "unpersuasive" the opinion of the state agency psychological reviewer, Dr. Momot-Baker, who relied almost entirely on Dr. Murphy's report to reach her own conclusions (R. 37), or in formulating an RFC for plaintiff that did not include any express mental health limitations.

To be sure, there is some evidence in the record that would support the conclusion that plaintiff had greater limitations than those the ALJ built into her RFC. But that is not the test. "If the reviewing court finds substantial evidence to support the Commissioner's final decision, that

decision must be upheld, even if substantial evidence supporting the claimant's position also exists." *Johnson v. Astrue*, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008). Having found that the ALJ's decision was supported by substantial evidence, I am required, under the "very deferential standard of review" that applies to ALJ fact-finding, to accept the Commissioner's RFC determination. *Brault*, 683 F.3d at 448; *see also Blalock v. Berryhill*, 2018 WL 6332896, at *14 (S.D.N.Y. Nov. 8, 2018) ("[T]he existence of contrary evidence does not negate substantial evidence supporting the ALJ's decision.").

## Conclusion

Because the ALJ properly considered plaintiff's non-severe mental health impairments in his determination of her RFC, and appropriately evaluated the medical opinions of Drs. Murphy and Momot-Baker, and because the RFC formulated by the ALJ was supported by substantial evidence in the record, plaintiff's motion (Dkt. No. 20) is DENIED, the Commissioner's motion (Dkt. No. 22) is GRANTED, and this action is DISMISSED.

The Clerk of Court is respectfully directed to close the case.

Dated: New York, New York
        March 21, 2022                          **SO ORDERED.**

                                                _____
                                                **BARBARA MOSES**
                                                **United States Magistrate Judge**